The Honorable Barbara J. Rothstein

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

JOSH KLEIN; COVALENCE CAPITAL LLC,

    Plaintiffs,

vs.

DOUGLAS JAE WOO KIM,

    Defendant.

Case No. 2:20-cv-01628-BJR

ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

## I. INTRODUCTION

Plaintiffs Josh Klein and Covalence Capital, LLC ("Covalence"), filed this lawsuit against defendant Douglas Jae Woo Kim, alleging Defendant fraudulently induced Plaintiffs to lend him money for cryptocurrency trading and then breached the parties' contract. Before the Court is Plaintiffs' motion for summary judgment. Having reviewed the motion, the record of the case, and the relevant legal authorities, the Court will grant the motion in part and deny it in part. The reasoning for the Court's decision follows.

## II. BACKGROUND

Plaintiff Klein is a principal of Covalence, a cryptocurrency investment fund. Dkt. 25 at

4. Defendant is an experienced cryptocurrency trader. *Id.*; Dkt. 66 at 3-4. In October 2018, Plaintiffs began making a series of short-term, high-interest cryptocurrency loans to Defendant. Dkt. 25 at 5-6; Dkt. 66 at 5-6. For example, one of Plaintiffs' first loans was for 160,000 USDT[1] with an interest rate of 10% over 90 days—equating to 40% annually. Dkt. 66 at 4. Plaintiffs allege that their decision to loan cryptocurrency to Defendant was based in part on Defendant's representations, in the summer of 2018, that he possessed roughly $1 million worth of bitcoin and $350,000 in cash and securities. Dkt. 25 at 5. Defendant also told Plaintiffs that he had a "cold storage wallet"—a locked device holding digital currency—containing an unspecified sum. *Id.*

Prior to the spring of 2019, plaintiff Klein and Covalence together made more than 10 loans to Defendant.[2] Dkt. 66 at 4; Dkt. 25 at 5-6. It is undisputed that Defendant repaid these loans. Dkt. 66 at 4; Dkt. 25 at 6 (caveating that some payments were late). In February 2019, the parties entered into a revolving credit arrangement (the "revolver") on which Defendant could draw as needed. Dkt. 66 at 5; Dkt. 25 at 6. Thereafter, the parties folded various outstanding loans into the revolver. Dkt. 66 at 5; Dkt. 25 at 6. According to Plaintiffs, this effectively gave the revolver a credit limit of 400,000 USDT. Dkt. 25 at 6.

The parties dispute how many additional loans Plaintiffs made in 2019 and how many of them were repaid. *See* Dkt. 66 at 5-6; Dkt. 25 at 6-8. However, it is clear that at some point in 2019, Defendant began having difficulty repaying Plaintiffs. Plaintiffs present ample evidence,

---

[1] "Tether (USDT) is an Ethereum token that is pegged to the value of a U.S. dollar . . . ." *Tether price*, COINBASE, https://www.coinbase.com/price/tether (last visited Mar. 6, 2022).

[2] The parties' briefs use different timelines and thus the exact number is unclear.

...

in the form of text messages and emails, that Defendant continued to ask for additional funds throughout the remainder of the year. Dkt. 25 at 7-10. Plaintiffs characterize Defendant's requests as increasingly desperate, citing Defendant's offering to accept "oppressive" borrowing terms, such as a late fee of $2,000 per day. Dkt. 25 at 9. Defendant also made several attempts to reassure Plaintiffs that he possessed sufficient assets to guarantee Plaintiffs' loans. In May 2019, Defendant claimed that his cold storage wallet contained $4-5 million worth of bitcoin. Dkt. 25 at 7. In July 2019, Defendant sent Plaintiffs a spreadsheet purportedly showing that his assets dwarfed his liabilities and that Plaintiffs' loans were his only outstanding liabilities. *Id.* at 8. He also sent a screenshot of a bank statement showing a balance of approximately $250,000. *Id.*

Although Plaintiffs extended a handful of very small loans to Defendant in the second half of 2019, they refused to substantially increase his credit unless Defendant either repaid some of his outstanding debt or provided proof of his ability to pay. *See* Dkt. 25 at 8. Specifically, Plaintiffs asked Defendant to send them his cold storage wallet and provide the password as collateral. Dkt. 25 at 9. Defendant responded that he would send the wallet but not the password. *Id.* According to Plaintiffs, viewing the amount of funds in the wallet and accessing the funds would have been impossible without Defendant's password. *Id.* While discussing a plan to meet for drinks in December 2019, Klein asked Defendant to at least show him the wallet's balance. *Id.* Defendant demurred and, when the parties met, he disclosed that there were third-party claims against his assets and that he had provided those assets (including the wallet) to his attorney. *Id.* at 9-10. Shortly thereafter, Plaintiffs terminated the revolver, which

3

triggered Defendant's duty to pay. *Id.* at 10. It is undisputed that Defendant never repaid the outstanding balance.

In July 2020, the U.S. Attorney for the Northern District of California filed a criminal complaint charging Defendant with wire fraud in connection with a cryptocurrency trading scheme ostensibly similar to the one described in Plaintiffs' complaint. Plaintiffs were not named as victims in the criminal complaint. Dkt. 50-9. Plaintiffs initiated this action in November 2020. Dkt. 1. The parties began discussing discovery in January 2021. *See* Dkt. 65 at 2. It appears that Plaintiffs sent Defendant 20 discovery requests—six interrogatories, five document requests, and nine requests for admission. Dkts. 28-6, 28-7. Defendant did not substantively respond to any of these discovery requests, but instead broadly invoked his Fifth Amendment right against self-incrimination.[3] *Id.*

Plaintiffs filed their motion for summary judgment on April 19, 2019—well before the discovery cutoff, which was then set for January 2022 and later moved to September 2021. *See* Dkts. 19, 25, 38. Plaintiffs' motion seeks an adverse inference against Defendant based on his refusal to respond to discovery requests on Fifth Amendment grounds. Dkt. 25. On November 17, 2021, the Court denied Defendant's motion to stay this case pending the conclusion of the criminal proceedings against him and ordered him to respond to Plaintiffs' summary judgment motion. Dkt. 65.

---

[3] Defendant also objected to the relevance and scope of the requests. Dkts. 28-6, 28-7.

### III. LEGAL STANDARDS

"The standard for summary judgment is familiar: 'Summary judgment is appropriate when, viewing the evidence in the light most favorable to the nonmoving party, there is no genuine dispute as to any material fact.'" *Zetwick v. County of Yolo*, 850 F.3d 436, 440 (9th Cir. 2017) (quoting *United States v. JP Morgan Chase Bank Account No. Ending 8215*, 835 F.3d 1159, 1162 (9th Cir. 2016)). A court's function on summary judgment is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). If there is not, summary judgment is warranted.

"Parties are free to invoke the Fifth Amendment in civil cases, but the court is equally free to draw adverse inferences from their failure of proof." *SEC v. Colello*, 139 F.3d 674, 677 (9th Cir. 1998). "[I]n a civil proceeding, 'the parties are on a somewhat equal footing, one party's assertion of his constitutional right should not obliterate another party's right to a fair proceeding.'" *Doe ex rel. Rudy-Glanzer v. Glanzer*, 232 F.3d 1258, 1265 (9th Cir. 2000) (citation omitted). An adverse inference is thus a means of mitigating the disadvantage to "an adverse party who is deprived of a source of information that might conceivably be determinative in a search for the truth." *Id.* at 1264. The Ninth Circuit has upheld summary judgment based on adverse inferences in appropriate circumstances. *E.g.*, *Colello*, 139 F.3d at 678 ("[S]ummary judgment may seem harsh, but [the defendant] refused to give information necessary to determine [liability] . . . .").

However, an adverse inference should be taken no further than is necessary to remedy the prejudice to the party deprived of discovery. *Glanzer*, 232 F.3d at 1265. "The inference may not be drawn 'unless there is a substantial need for the information and there is not another less

burdensome way of obtaining that information.'" *Nationwide Life Ins. Co. v. Richards*, 541 F.3d 903, 912 (9th Cir. 2008) (quoting *Glazner*, 232 F.3d at 1264). Additionally, there must be some "independent evidence of the fact about which the party refuses to testify." *Id.*

Although the Ninth Circuit has rejected the notion that a court must "tailor its adverse inference[s] . . . on a 'question-by-question basis,'" the inferences drawn cannot be entirely untethered from the questions asked and the requests made during discovery. *SEC v. Jasper*, 678 F.3d 1116, 1126 (9th Cir. 2012); *see also Glazner*, 232 F.3d at 1265-66 (the Fifth Amendment privilege, and thus any inference drawn from it, "necessarily attaches only to the question being asked and the information sought by that particular question").

## IV.   DISCUSSION

### A. Breach of Contract

Plaintiffs seek summary judgment on their claim for breach of contract based on Defendant's failure to repay several of their loans. As stated above, Defendant does not dispute that he failed to repay the loans in question. His only asserted defense to this claim is that the loans were usurious. Dkt. 66 at 14-16.

Loan agreements setting an interest rate greater than 12% are deemed usurious by Washington statute and are unenforceable. *See Liebergesell v. Evans*, 93 Wn.2d 881, 891-92 (1980). Plaintiffs do not dispute that their loans to Defendant carried interest rates that (when annualized) were above 12% or that the other elements of usuary are met. *See* Dkt. 25 at 15; *see also* Dkt. 66 at 14 (listing elements of usuary defense). Instead, Plaintiffs argue that the loans were for business, rather than personal, purposes and that business loans are exempt from the usury statute. Dkt. 25 at 15 (citing RCW 19.52.080). Defendant retorts that there is a genuine dispute

as to whether the loans were for business purposes. Dkt. 66 at 15-16.

The Court finds that no reasonable jury could find that the loans in question were for personal use. Under Washington law, the purpose of a loan is "principally established by the representations the borrower makes to the lender at the time the loan is procured." *Marashi v. Lannen*, 55 Wn. App. 820, 823 (1989).

The record in this case is replete with representations by Defendant that he was using Plaintiffs' loaned cryptocurrency to make trades and turn a profit. At various times, Defendant stated that he needed a loan to "do some crypto trades," make "[m]ore intraday [trades]," and "wet [his] beak in this market." Dkt. 26 at ECF 20, 254-56. Although not all of Defendant's statements were this explicit, the voluminous records of text message conversations submitted by Plaintiffs show that Defendant was constantly referring to his cryptocurrency trading when discussing Plaintiffs' loans. *See* Dkt. 25 at 16-18; *see generally* Dkt. 26. There is no hint in any of these conversations that Defendant might be using the loans for any other purpose. Defendant has failed to produce any discovery that might create a genuine dispute as to the purpose of Plaintiffs' loans. Accordingly, the Court finds that the elements of breach of contract are met and that Plaintiffs are entitled to summary judgment on that claim.

**B. Fraud**

Plaintiffs also seek summary judgment on their fraud claim, asserting that Defendant misrepresented his assets and liabilities to induce Plaintiffs to loan him cryptocurrency. A fraud claim has nine elements in Washington: "(1) a representation of existing fact, (2) that is material, (3) and false, (4) the speaker knows of its falsity, (5) intent to induce another to act, (6) ignorance of its falsity by the listener, (7) the latter's reliance on the truth of the representation, (8) her right

to rely on it, and (9) consequent damage." *Boyer Nat'l Bank v. Faust*, 6 Wash. App. 2d 375, 381 n.4 (2018) (citing *Pedersen v. Bibioff*, 64 Wash. App. 710, 723 n.10 (1992)).

The central dispute in this case is over falsity and reasonable reliance. Plaintiffs identify the following allegedly false statements made by Defendant: (1) Defendant falsely told Plaintiffs that he had no other creditors; (2) Defendant overstated his assets and thus his ability to guarantee Plaintiffs' loans; (3) Defendant falsely claimed that he possessed a significant amount of cryptocurrency in his cold storage wallet that could be used to secure Plaintiffs' loans; (4) Defendant misrepresented how he was using the funds loaned by Plaintiffs. Dkt. 72 at 10-12. Plaintiffs argue that Defendant's refusal to produce any discovery related to these alleged misrepresentations entitles them to an adverse inference that each of the statements was indeed false. *See* Dkt. 25 at 22-24; Dkt. 72 at 3-7. Defendant contends that Plaintiffs are not entitled to an adverse inference because they have not produced any independent, corroborating evidence apart from Defendant's silence. Dkt. 66 at 7-14.

There is some merit to both parties' arguments. Defendant has clearly obstructed the discovery process and prevented Plaintiffs from accessing information that would go directly to their fraud claim, even though Plaintiffs fully cooperated in discovery. This is indeed the type of unfair disadvantage an adverse inference is designed to remedy. However, Plaintiffs must do more to support their entitlement to the sweeping adverse inference they seek.

First, the connection between Plaintiffs' discovery requests and the specific facts they must prove is too attenuated. Plaintiffs' six interrogatories and five document requests essentially asked Defendant to identify, or produce documents related to, his assets, liabilities, and cryptocurrency trading activities during the relevant period. Although Defendant's refusal to produce any of this

information may warrant an adverse inference generally, Plaintiffs' requests are far too broad and too few to support all of the elements of fraud.

Second, Plaintiffs have left several sources of relevant information untapped. Plaintiffs did not subpoena Defendant for a deposition because they assumed he would refuse to answer any questions. Dkt. 53 at 9. Although this may be true, a deposition would allow Plaintiffs to ask Defendant about specific representations he made and other factual questions that go directly to the elements of fraud. If Defendant invokes the Fifth Amendment in response to all of these questions, the Court may then draw an adverse inference more tailored to the elements Plaintiffs must establish.

Additionally, Plaintiffs have not attempted to compel the production of documents from Defendant. The Fifth Amendment privilege does not extend to the production of documents unless the act of production itself is testimonial in nature. *See United States v. Oriho*, 969 F.3d 917, 924 (9th Cir. 2020). Whether the Fifth Amendment applies to the documents Plaintiffs seek in this case is an open question that the Court cannot decide at this time, but Plaintiffs must at least exhaust this potential avenue for obtaining independent evidence to support their claim.

In summary, Plaintiffs' motion for summary judgment on their fraud claim is denied without prejudice to renew once Plaintiffs have pursued additional discovery.

### V. CONCLUSION

For the foregoing reasons, the Court hereby grants in part and denies in part Plaintiffs' motion for summary judgment (Dkt. 25). The Court grants summary judgment on Plaintiffs' breach of contract claim but denies summary judgment on Plaintiffs' fraud claim without prejudice.

DATED this 10th day of March, 2022.

                                                                                          */s/ Barbara J. Rothstein*
                                                                                         BARBARA J. ROTHSTEIN
                                                                                         UNITED STATES DISTRICT JUDGE